[L. A. No. 4030.  In Bank.—March 24, 1916.]

WESTERN METAL SUPPLY COMPANY, Petitioner, v. A. J. PILLSBURY et al., as Members of and Constituting The Industrial Accident Commission of the State of California, Respondents.

WORKMEN'S COMPENSATION ACT—CONSTITUTIONAL LAW—AWARD OF COMPENSATION—DEPENDENTS OF KILLED EMPLOYEES—INDUSTRIAL ACCIDENT COMMISSION.—The legislature has no authority, independently of the express constitutional sanction conferred by section 21 of article XX of the constitution, adopted October 10, 1911, to vest in the Industrial Accident Commission the power to make awards against employers, in favor of dependents of employees, where injury to the latter has resulted in their death.

ID.—POWER EXERCISED BY COMMISSION IS JUDICIAL—CONSTITUTIONAL AUTHORIZATION NECESSARY TO EXERCISE OF POWER.—The power granted to the commission by the Workmen's Compensation, Insurance, and Safety Act of 1913, to determine that a right to compensation exists, and to fix by an award the amount of such compensation, is judicial in its nature, and, in exercising this power, the commission is performing precisely the same functions that are performed by any court in passing upon questions brought before it. In the absence of a special enabling provision of the constitution, such judicial power could not, in view of the provisions of section 1 of article VI of the constitution, be vested in the Industrial Accident Commission.

ID.—CONSTRUCTION OF SECTION 21, ARTICLE XX OF CONSTITUTION— AWARDS TO DEPENDENTS OF KILLED EMPLOYEES AUTHORIZED.— Section 21 of article XX of the constitution, authorizing the legislature to "create and enforce a liability on the part of all em-

ployers to compensate their employees for any injury incurred by the said employees in the course of their employment," contemplates and authorizes legislation creating a liability to pay compensation to dependents of employees whose death has resulted from injury incurred in the course of their employment, and empowers the legislature to provide for the adjudication of questions concerning the liability by an Industrial Accident Commission.

ID.—CHANGE IN LAWS REGULATING RELATION OF EMPLOYER AND EMPLOYEE.—The amendment of section 21 of article XX of the constitution, was designed to establish the authority of the legislature to pass laws making the relation of employer and employee subject to a system of rights and liabilities different from those prevailing at common law, and should not be given too strict or literal an interpretation.

ID.—PROVISION FOR DEATH BENEFITS NOT INIMICAL TO FEDERAL CONSTITUTION.—The provisions of the Workmen's Compensation Act authorizing such death benefits, like that for the payment of compensation to injured employees themselves, is a regulation of the conditions surrounding the employment of labor, and is to be justified upon similar grounds. There is nothing in such provision inimical to the federal constitution.

ID.—AWARDS TO ALIEN AND NONRESIDENT DEPENDENTS.—The statute is not rendered unconstitutional by reason of the fact that under it the employer may be required to make payments to alien and nonresident dependents.

ID.—DEATH OF NIGHT WATCHMAN—EMPLOYMENT BY DIFFERENT EMPLOYERS.—A finding of the commission that the person for whose death compensation was awarded was an employee of the corporation against whom the award was made, is supported by evidence that such person was engaged as a night watchman by such corporation at a monthly compensation for his services, notwithstanding he was also independently employed by other corporations to perform similar services for them, under separate contracts under which he received a monthly compensation from each of them.

ID.—INDEPENDENT EMPLOYERS NOT A "VOLUNTARY ASSOCIATION."—The various corporations so separately employing such watchman did not constitute a "voluntary association," within the meaning of section 13 of the Workmen's Compensation Act including such an association within the definition of an employer.

ID.—ACCIDENT—WILLFUL SHOOTING BY THIRD PERSON.—The killing of an employee may be "accidental," within the meaning of the Workmen's Compensation Act, notwithstanding it resulted from the willful act of a third person in shooting him.

ID.—BASIS OF COMPENSATION—DEATH OF EMPLOYEE HAVING SEVERAL EMPLOYERS—EARNINGS IN ENTIRE EMPLOYMENT.—Where an employee employed in a given capacity by different employers, to

each of whom he renders service for a portion of his time, is killed while in the service of one of them, an award of compensation is properly made against the latter, and is properly based upon the aggregate amount which the employee was in the habit of earning in his entire employment, rather than upon the amount which he had been receiving from the employer against whom the award is made.

APPLICATION for a Writ of Certiorari to review an award of the Industrial Accident Commission.

The facts are stated in the opinion of the court.

Chickering & Gregory, for Petitioner.

Christopher M. Bradley, and R. C. Springer, for Respondents.

SLOSS, J.—This is a writ of *certiorari* to review an award of the Industrial Accident Commission allowing compensation to the widow of James Mason who, the commission found, had been accidentally killed while in the employ of the petitioner, Western Metal Supply Company.

Among other grounds of attack on the award, it is contended that the Industrial Accident Commission is without jurisdiction to allow compensation to dependents where the accident has resulted in the death of an employee. The question thus raised goes to the very foundation of the commission's authority to act at all on applications for death benefits. It is involved in a large number of cases now pending in this court, in addition to the present one. It will not be necessary to repeat our views regarding the constitutionality of the general scheme of compensation embodied in the "Workmen's Compensation, Insurance, and Safety Act" of 1913. We have treated this question at some length in our recent decision in *Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686, [151 Pac. 398]. In that case the court was dealing with the claim of the injured employee himself. We had before us no question touching the right of any other person to receive compensation on account of an injury which had resulted in the death of the employee. While in some of the later cases decided here, death claims were in fact involved, the questions now to be considered were not presented, or, if presented,

were passed as being unnecessary to the disposition of the cases. Now, however, the authority of the commission to make an award in death cases is directly assailed, and we are called upon to decide whether that authority exists.

The argument on behalf of the petitioner is divided into two branches. It is contended, first, that the legislature has no authority to create a right to compensation in favor of the dependents of an employee who has sustained injuries resulting in his death, and, second, that if this right may be created, the Workmen's Compensation, Insurance, and Safety Act transcends constitutional limitations in attempting to vest in the Industrial Accident Commission the power—asserted to be judicial in its nature—to assess compensation and award it to such dependents.

The solution of the question thus raised depends, in its final analysis, on the construction of section 21 of article XX of the constitution, adopted October 10, 1911. That section reads:

"The legislature may by appropriate legislation create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment, irrespective of the fault of either party. The legislature may provide for the settlement of any disputes arising under the legislation contemplated by this section by arbitration, or by an industrial accident board, by the courts, or by either any or all of these agencies, anything in this constitution to the contrary notwithstanding."

Clearly the second clause of this section, authorizing the legislature to provide for the settlement of disputes by a board or commission, has no broader scope than the first clause, which sanctions the creation of a liability. The disputes which may thus be settled are those "arising under the legislation contemplated by this section." It would not avail, therefore, to say that the legislature has power, independently of this special constitutional authorization, to create a liability on the part of employers in favor of dependents of employees, unless it also has the power, without express constitutional sanction, to vest in the Industrial Accident Commission the power to make awards in such cases. That it has no such power is, we think, entirely beyond question. The power granted to the commission by the act to determine

that a right to compensation exists, and to fix by an award the amount of such compensation, is judicial·in its nature.   In this behalf it would not seem necessary to do more than refer to *Pacific Coast Casualty Co.* v. *Pillsbury*, 171 Cal. 322, [153 Pac. 24], where, in speaking of the action of the commission in settling disputes concerning the liability which the legislature had created, we said, "This action by such board would be an exercise of judicial power.   For that purpose it is in legal effect a court."   The correctness of this view is emphasized, indeed demonstrated, by a brief summary of the provisions of the act defining the duties and powers of the board with respect to claims for compensation.   The commission is vested with "full power, authority and jurisdiction to try and finally determine" all proceedings for the recovery of compensation (sec. 73a), subject only to the limited review provided in section 84 of the act.   The commission has power to administer oaths, to issue subpoenas (sec. 78), to take testimony (sec. 24a), to punish for contempt "in the same manner and to the same extent as courts of record" (sec. 80).   Where compensation is sought the proceedings are in substance those of a court in an action at law.   "Application in writing" (i. e., a complaint) is filed with the commission by a party in interest (sec. 22).   The time and place for the hearing are fixed by the commission, and a copy of the application, together with notice of the time and place of hearing, is then served on the adverse party (sec. 22).   This is, in effect, the issuance and service of summons.   The adverse party must within five days file his answer (sec. 23).   Here we have the usual framing of issues by the pleadings of the parties.   After hearing by the commission, it makes and files its findings of facts and its "award which shall state its determination as to the rights of the parties" (sec. 25).   The findings thus made are "conclusive and final" (sec. 84c), and the award itself is not reviewable except by a writ of *certiorari* under which the review is restricted in scope (sec. 84).   Any party in interest may file a certified copy of the findings and award with the clerk of the superior court, and judgment must be entered by the clerk in conformity therewith (sec. 26).   The commission itself may stay the execution of any judgment so entered, and may order entry of the satisfaction of the judgment (sec. 26).

The commission, in exercising these powers, is performing precisely the same functions that are performed by any court in passing upon questions brought before it. "Judicial power," says Mr. Justice Miller in his work on the constitution, "is the power of a court to decide and pronounce a judgment and carry it into effect between persons who bring a case before it for decision." (*Muskrat* v. *United States,* 219 U. S. 346, [55 L. Ed. 246, 31 Sup. Ct. Rep. 250].) "It is the inherent authority not only to decide but to make binding orders or judgments which constitutes judicial power. . . ." (*Underwood* v. *McDuffee,* 15 Mich. 361, [93 Am. Dec. 194], quoted in *People* v. *Hayne,* 83 Cal. 111, [17 Am. St. Rep. 217, 7 L. R. A. 348, 23 Pac. 1] ; see, also, *Marin Water & Power Co.* v. *Railroad Commission,* decided January 17, 1916, 171 Cal. 706, [154 Pac. 864, 866], where judicial power is defined.) The Industrial Accident Commission is given the power to make binding orders or judgments. In making an award upon which the clerk must enter a judgment, the action of the commission does not differ from that of a judge who directs the entry of judgment by the clerk of the court. The entry of judgment follows automatically upon the filing of the findings and award of the commission. The clerk acts ministerially, and with no other authority than that of the commission itself, as evidenced by the certified copy of its proceedings. No judicial action on the part of the superior court or a judge thereof is required to give to the commission's award the full force and effect of a judgment.

We do not overlook the consideration that administrative boards and officers are often called upon to determine the facts and apply the law to those facts. Such bodies and officers do not exercise judicial functions in the strict sense of that term. (*Ex parte Whitley,* 144 Cal. 167, [1 Ann. Cas. 13, 77 Pac. 879].) We might cite many cases dealing with the acts of bodies like the interstate commerce commission, boards of medical and dental examiners, and other boards or officers authorized to pass on various questions. These cases generally hold that judicial power is not exercised in the performance of the various functions committed to such boards. But none of these cases had to do with a situation like the present, where the law creates a right in one person against another, and vests a board with the jurisdiction to hear complaints, to issue process, to compel the attendance of wit-

nesses, to determine conclusively the issues raised by the pleadings of contending parties, and to make a final judgment or award determining the rights of those parties. As was said in *State* v. *Hawkins,* 44 Ohio St. 98, [5 N. E. 228], one of the cases cited by the respondents, ''it may be safely conceded that power to hear and determine rights of property and of persons between private parties is judicial and can only be conferred on the courts.''

It is true that in several cases involving compensation statutes, it has been held that the boards or officers authorized to determine the facts upon which the right to compensation arose were exercising executive or administrative rather than judicial powers. (*Borgnis* v. *Falk Co.,* 147 Wis. 327, [37 L. R. A. (N. S.) 489, 133 N. W. 209] ; *Mackin* v. *Detroit T. A. Co.* (Mich.), 153 N. W. 49; *Kennerson* v. *Thames Towboat Co.* (Conn.), 94 Atl. 372.) But in none of these cases was the court considering a statute which gave to a commission powers as extensive as those vested by our law in the Industrial Accident Commission. We shall not take the time to review in detail the cases just cited, but content ourselves with saying that we think there is nothing in them which would support the claim that the powers exercised by the Industrial Accident Commission of this state, in making awards of compensation, are not strictly judicial.

In the absence of a special enabling provision of the constitution, judicial power could not be vested in the Industrial Accident Commission. Section 1 of article VI of the constitution provides that ''the judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts of appeal, superior courts and such inferior courts as the legislature may establish in any incorporated city or town, township, county, or city and county.'' It is clear that the Industrial Accident Commission is not one of the courts thus designated. It is equally clear that the grant contained in the section of the constitution just cited, unless modified by other constitutional provisions, is exclusive. ''Except for local purposes, the section disposes of the whole judicial power of the state, and vests all of it in the courts expressly named therein, leaving none at the disposal of the legislature.'' (*Pacific Coast Casualty Co.* v. *Pillsbury,* 171 Cal. 319, [153 Pac. 24].) We are, then, brought back to the inquiry whether section 21 of article XX

of the constitution contemplates and authorizes legislation creating a liability to pay compensation to dependents of employees whose death has resulted from injury incurred in the course of their employment. If the legislature is by this constitutional provision authorized to create the liability, it is equally empowered to provide for the adjudication of questions concerning the liability by an Industrial Accident Commission.

The essential language of section 21 is this: The legislature may ''create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment.'' The contention of the petitioner is that this language is not broad enough to cover a compensation to be paid to any one but the injured employee himself. But we are not to give too strict and literal interpretation to a constitutional amendment which aims to enlarge the power of the legislature, or to remove doubts concerning its power to legislate on a given subject. The constitutional amendment, as is perfectly apparent from its terms, was designed to establish the authority of the legislature to pass laws making the relation of employer and employee subject to a system of rights and liabilities different from those prevailing at common law. That system was one which had already been adopted in many jurisdictions. The statutes putting it into force were commonly known as workmen's compensation laws. In every one of those laws, provision was made not only for compensation or indemnity to an employee who survived his injury, but for payment to the heirs or dependents of an employee who had received a fatal injury. (2 Boyd, Workmen's Compensation, sec. 213.) The two kinds of payment have always been regarded as component parts of a single scheme of rights and liabilities arising out of a given relation. (See *Huyett* v. *Pennsylvania R. Co.*, 86 N. J. L. 683, [92 Atl. 58].) It is true that at common law there was no action for torts causing death. The right of action died with the injured person. Accordingly, it is universally held that statutes like section 377 of the Code of Civil Procedure, giving an action for wrongful act or neglect causing death, create a right entirely distinct from that which was vested in the injured person before his death. But the analogies of the common law cannot be applied too closely to this new scheme, which undertakes

to supersede the common law altogether, and to create a dif-· ferent standard of rights and obligations, covering the entire field of injury to workmen in the course of their employment. That the constitutional amendment was designed to authorize the establishment of the new system cannot be doubted. In view of the general trend of legislation on this subject, we think the language of the constitutional amendment was not inapt to describe a scheme of liability which should include the entire field embraced within the prior laws. Compensation means more than a mere cash payment to an individual. Compensation to employees for injuries incurred by them may fairly be said to mean not only a money payment to the employee himself, but provision or indemnification for the various elements of loss which may be the direct result of his injury. It includes, for example, the obligation to provide medical and surgical treatment (sec. 15, subd. a)—an obligation which does not necessarily involve payment in cash to the employee himself. It may equally be said to cover some provision for those who had been entitled to look to the employee for their support, and who by his death are deprived of that support. If the law provided that while an injured workman was disabled, payments should be made to his family during the period of the disability, this would be one form of compensation to the workman. It would hardly be claimed that such a provision was beyond the scope of the constitutional authorization. On similar reasoning it may fairly be said that where a workman is killed, the requirement that a payment shall, for a given period, be made to his dependents for their support is also a provision for compensation to the workman within the meaning of section 21 of article XX.

We have not thought it necessary to discuss at any length the objections to this legislation based upon the provisions of the federal constitution. As we have said, the subject is fully covered, so far as concerns injuries not resulting in death, by the decision in *Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686, [151 Pac. 398]. We see no distinction between such cases and the allowance of death benefits. The provision for such death benefits, like that for the payment of compensation to injured employees themselves, is a regulation of the conditions surrounding the employment of labor, and is to be justified upon similar grounds. It is argued that under

the statute the employer may be required to make payments to alien and nonresident dependents, and that no public purpose cognizable by the legislature of this state is to be served by requiring payments to such aliens and nonresidents. But this argument is based upon altogether too narrow a view of the constitutional limitations upon legislative action. If it may reasonably be thought that the best interests of the state, of the employers of labor and of those employed, as well as of the public generally, are promoted by imposing upon the industry or the public the burden of industrial accident—and some such theory lies at the bottom of all workmen's compensation statutes (*Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686, [151 Pac. 398])—the residence and citizenship of the injured workman, or (if he shall have met death) of his dependents, are factors entirely foreign to the discussion. The legislature has determined that the employment of labor in given pursuits entails upon the employer certain responsibilities toward the persons performing the labor and those dependent upon them. There is no constitutional or rational ground for limiting the benefits of this legislative scheme to citizens or residents of this state. If the employment was such as to fall within the state's lawmaking jurisdiction, the legislature certainly had the power to pass laws operating uniformly upon all persons affected by such employment.

In addition to the constitutional questions which we have discussed, the petitioner urges various grounds of objection to the action of the commission.

The facts upon which the award was based are somewhat peculiar. James Mason was employed as a night watchman by the applicant, Western Metal Supply Company, and at the same time by five other corporations. He made regular rounds of the premises of the six employers. For his services he received thirty dollars per month from the applicant. The others for whom he acted as watchman paid him different sums, his aggregate monthly earnings from the six employers being $116. The Western Metal Supply Company knew that he was acting as watchman for other employers, but did not know the number of such other employers nor the identity of all of them. Mason's employment was by separate agreement with each of his employers, and not by any joint agreement or joint employment. In addition to the foregoing facts, the commission found that "the employment of Mason

by the defendant was personal in its nature, and was intended by the parties to be a contract of hire of an agreed portion of his personal service; that on the morning of the 9th day of March, 1914, the dead body of said James Mason was found upon the premises of the defendant Western Metal Supply Company, death having been caused by gun shot wounds inflicted by unknown persons engaged at the time of the murder in committing burglary upon the said premises." There were findings, in the language of the statute, of the other jurisdictional facts authorizing an award. The commission awarded to the applicant, the widow of James Mason, compensation amounting to three times Mason's average annual earnings, such average annual earnings being based upon the aggregate amount which he received from his six employers.

The petitioner argues that the facts above recited do not justify the conclusion that Mason was an employee of the petitioner. On the contrary, it is insisted, he was an independent contractor. Section 13 of the act defines the term "employer" as "every person, firm, voluntary association and private corporation . . . who has any person in service under any appointment or contract of hire . . . ." The term "employee" is defined in section 14 as "every person in the service of an employer . . . under any appointment or contract of hire." If it be conceded that the relationship thus described is that of master and servant, as defined in section 2009 of the Civil Code, it must nevertheless be held that the evidence before the commission justified the finding that Mason was a servant of the appellant. "The real test by which to determine whether a person is acting as the servant of another is to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control and was liable to be discharged by him for disobedience of orders or misconduct." (Wood on Master and Servant, sec. 317.) If Mason had been working for the petitioner alone as night watchman, it could hardly be claimed that he was not to be regarded as a servant of such petitioner. He would have been "in the service" of the employer "under a contract of hire," to use the language of the Workmen's Compensation Act, or, if we look to section 2009 of the Civil Code, it might well have been found that he was "employed to render personal service to his employer otherwise than in the pursuit of an independent calling," and in such service

CLXXII Cal.—27

remained "entirely under the control and direction" of the employer. The fact that Mason was working at the same time for different employers is not necessarily inconsistent with the relation of master and servant between any one of such employers and himself. (1 Labatt on Master and Servant, 2d ed., sec. 2.) The findings and conclusions of the commission on questions of fact are conclusive. (Sec. 84c.) If a finding has the support of substantial evidence, it is beyond review here. The most that can here be said is that a finding that Mason was an independent contractor might reasonably have been made. But certainly the conclusion to the contrary was one that could have been entertained by a rational mind. It is, therefore, binding upon this application.

It is not disputed that the evidence warranted the inference that the killing of Mason occurred while he was "performing services growing out of and incidental to his employment and acting within the course of his employment as such." (Workmen's Compensation Act, sec. 12a.) It is argued that because the shooting was the willful act of a third person, the killing was not accidental. This contention cannot be sustained. In *Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686, [151 Pac. 398], we upheld an award for injuries received by an employee through the willful assault of a fellow-workman. That decision establishes the proposition that an injury may be accidental, even though it be intentionally inflicted by a third person.

As stated above, section 13 of the act includes in the definition of employer every "voluntary association" having any person in service under any appointment or contract of hire. We think there is no force in the claim that the six corporations for which Mason was acting as watchman constituted a "voluntary association." As the commission found, there was no joint agreement between the various employers nor any joint employment by them. Each made a separate agreement with Mason. Clearly these six employers, each acting independently and without concert with the others, cannot be brought within any fair meaning of the term "voluntary association."

Finally, the petitioner claims that the award against it should be based, not upon Mason's total earnings, but upon the amount (i. e., thirty dollars per month) which he received from it. The solution of this question is by no means

free from difficulty.   At first sight there is much plausibility in the contention that an employer, whose liability is based on the earnings of his employee, should not be compelled to pay an award measured by the earnings received by the employee from others.   The statute contains no provision which can be said to point to a clear solution of this problem. Probably the framers of the act did not have in mind the specific case of a workman employed in a given capacity by different employers, to each of whom he rendered services for a portion of his time.   It must be remembered, however, that the main purpose of the act is to indemnify the workman for the loss suffered by him.   The indemnity takes two forms—the furnishing of medical attention, and payment of a proportion of the earnings lost in consequence of the injury.   In case of death, the amount payable is a percentage "of the average annual earnings of the deceased employee." A fair compensation is to be paid to the employee, or to the dependents who have lost in him their source of support. It should be based upon the amount which the employee was in the habit of earning in the particular kind of employment, rather than the amount which he had been receiving from a particular employer.   This was the view taken by the supreme judicial court of Massachusetts in dealing with a statute which, in this regard, is not unlike our own.   A longshoreman was injured while working for a steamship company. He had been employed part of the time by this company, and had earned, on an average, eight dollars per week from it.   His total earnings from all employers averaged thirteen dollars per week.   It was held, in Gillen's case (215 Mass. 96, [L. R. A. 1916A, 371, 102 N. E. 346], that the award of compensation was properly based upon the employee's average weekly earnings as longshoreman from all sources.   The court said that "the loss of his capacity to earn, as demonstrated by his conduct in such regular employment, is the basis upon which his compensation should be based."   This conclusion which, we think, is the correct one, does not conflict with the rules laid down in section 17 of the act for computing the average annual or weekly earnings of an employee.   That section in several of its subdivisions clearly contemplates the payment of awards which are not based upon the amount actually received by the employee from the particular employer in whose service he was at the time of the injury.

There is undoubtedly an element of hardship in throwing the entire burden upon the applicant. The burden is, however, thrown upon it under the act by reason of the fact that the employee was killed while in its service.

The award is affirmed.

ANGELLOTTI, C. J., Concurring.—I concur in the judgment, and also in the opinion of Mr. Justice Sloss. I desire to add a few words as to my views on the question of the proper construction of section 21 of article XX of the constitution. I am entirely satisfied, as held by the court, that there is to be found in such provision, in view of the circumstances which we have a right to consider in construing the language of such a constitutional provision, an intent to include the whole subject matter of compensation for injuries to employees in the course of their employment, including death, regardless of the fact that the compensation in the event of death goes to dependents of the employee. Of course, it must be conceded that where a constitutional provision is so clear and unambiguous as to leave no doubt as to its meaning, the courts are not at liberty to alter the meaning so expressed by resort to other considerations, and the intent of the people in adopting the provision, which is necessarily the governing factor, must be determined solely by the language they have used. In such a case, while the object of construction of such a provision is simply to give effect to the intent of the people in adopting it, that intent is to be found in the provision itself. But in considering the language used, extremes of both a liberal and a strict construction are to be avoided, and mere technical rules of construction are often to be disregarded. As an illustration, Mr. Cooley says that the maxim that statutes in derogation of the common law should be strictly construed can seldom with propriety or safety be applied to constitutional provisions. In this connection he also says: "When these amendments assume to make any change in the common law the change designed is generally a radical one; but as they do not go minutely into particulars, as do statutes, it will sometimes be easy to defeat a provision if courts are at liberty to say that they will presume against any intention to alter the common law further than is expressly declared. A reasonable construction is what such an instrument demands and should receive; and the real question

is what the people meant, and not how meaningless their words can be made by the application of arbitrary rules.'' (Cooley, Constitutional Limitations, 7th ed., p. 89.)

Section 21 of article XX of the constitution was proposed to the electors as an amendment by the legislature at the regular session of 1911, the same session at which was adopted the so-called Roseberry Workmen's Compensation Act, the compensation provisions of which were elective as to both employer and employee. The latter act was the first step in this state toward substituting for the old system of an action in the courts for the recovery of damages from an employer for injuries to a workman in cases where the employer was found guilty of some negligence or misconduct, the general system of compensation for injuries incurred by employees in the course of their employment embodied in workmen's compensation laws in various other states and countries, a system imposing liability for compensation irrespective of the fault of either party, and generally administered by a commission. The nature of the very radical change proposed, and the reasons for such legislation, were discussed in the opinion of Mr. Justice Sloss in *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, [151 Pac. 398]. As we have said, the system provided by the Roseberry Act was elective, and there was grave question as to the power of the legislature, in view of certain provisions of our constitution as it then stood, to provide such a system as would be compulsory on all employers and employees coming within its terms, as is the system provided by the later act here under consideration, popularly known as the Boynton Act, enacted after the adoption of the constitutional amendment. As was said in *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, [151 Pac. 398], the most striking difference between the two laws, the Roseberry Act and the Boynton Act, is that the compensation provisions of the latter statute are compulsory. No one will question that the sole purpose of the amendment was to obviate such objection as might be made, based on provisions of our constitution, to legislation creating and providing for the enforcement of the liability incident to such a compulsory system. The paramount idea was to free the legislative department from the effect of certain constitutional provisions which might reasonably be contended to preclude the desired action, and to leave that department

with full power to deal with the particular subject matter, regardless of such constitutional provisions. As substantially said by counsel for the Industrial Accident Commission, the central thought of the amendment is not at all by way of limitation, but to fully grant authority to the legislature, if such authorization was necessary, to create and provide for the enforcement of this new scheme of liability to take the place of the old scheme based on fault.

The Roseberry Act, which, as I have said, was enacted at the same session at which the constitutional amendment was proposed, provided compensation for dependents of an employee who was fatally injured in the due course of his employment. So far as legislation has gone on this subject, such compensation is an inseparable part of every such system. As is said in 2 Boyd on Workmen's Compensation, sec. 213, ''Provision is universally made in all of the compensation acts to provide compensation for persons who wholly or in part depend upon an employee who is killed in the due course of employment.'' An examination of the laws of other states and countries on this subject shows that this statement is absolutely correct. The contention of petitioner in this regard would bring us to the conclusion that the legislature in proposing and the people in adopting the amendment under consideration, one designed to confer on the legislature full power to provide for the creation and enforcement of the liability attendant on such a system, intended to so limit the authority of the legislature in that regard as to preclude it from either creating or providing for the enforcement of any liability in connection therewith to pay compensation for the death of the employee to his dependents, a matter considered an essential part of the system in every workmen's compensation law ever enacted, and one embraced in the very law enacted by the legislature at the same session. It is difficult to understand how, in the nature of things, any such effect could have been intended. Does the language used compel such a conclusion as to the intent of the amendment?

So far as this question is concerned the material portion of the amendment is the first sentence. The language is: ''The legislature may by appropriate legislation create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment, irrespective of the fault

of either party.'' The remainder of the section has simply to do with the conferring of full power on the legislature to provide for the settlement of disputes arising under such legislation. The claim that no intent can here be found to include compensation for death to dependents must rest upon the fact that the words, ''their employees,'' were inserted after the words, ''to compensate,'' the language being ''to compensate their employees,'' for it is very clear that in the absence of these two words, the succeeding words, ''for any injury incurred by the said employees,'' could be fairly construed in no other way than as including any and all injuries, including death, thus making the section provide for the creation and enforcement of a liability on the part of all employers to compensate for any injury incurred or suffered by an employee in the course of his employment, including the compensation to dependents in the event of death. It does seem to me that such a claim attributes too much force, and too technical a meaning, to these two words in the connection in which they are used, one not in accord with their ordinary and popular significance in such a connection. We know that such acts as the Roseberry and Boynton Acts are generally and popularly known as ''*Workmen's* Compensation Laws,'' and, as we have seen, they invariably include a scheme for the compensation of dependents in the event of death. This term necessarily brings to the mind of any one a law including such a scheme as an essential part. And I believe that the same signification should be given to such phrases as ''compensation of employees,'' or ''to compensate their employees,'' or ''any injury incurred by the said employees,'' when used in a general way in connection with such laws, for I believe that such is the meaning ordinarily given to such language in this connection by the people generally. It is the popular signification in this connection. An examination of the titles adopted by those framing such laws is interesting as indicating the views of legislators on this subject. In Bradbury's Workmen's Compensation (2d ed.), we find the legislation of this and other countries pertaining thereto. In Great Britain the act of 1906 is entitled, ''An act to consolidate and amend the law with respect to compensation to workmen for injuries suffered in the course of their employment.'' (Vol. 2, p. 1735.) Our own Federal Compensation Law of May 30, 1908, for employees

of the government, is entitled, "An act granting to certain employees of the United States the right to receive from it compensation for injuries sustained in the course of their employment." (Vol. 1, p. 1049.) The Connecticut act is entitled, "An act concerning compensation to workmen injured in the course of their employment." (Vol. 2, p. 1144.) The title of the Kansas act is, "An act to provide compensation for workmen injured in certain hazardous industries." (Vol. 2, p. 1218.) The title of an act of Massachusetts is, "An act to provide for compensating certain public employees for injuries sustained in the course of their employment." (Vol. 2, p. 1262.) The title of the act of Alberta is, "An act with respect to compensation to workmen for injuries suffered in the course of their employment" (vol. 2, p. 1641); that of an act of British Columbia, "An act respecting compensation to workmen for accidental injuries suffered in the course of their employment" (vol. 2, p. 1641), and those of Manitoba and Nova Scotia the same. (Vol. 2, pp. 1655, 1698.) The act of Saskatchewan is entitled "An act respecting compensation to workmen for injuries suffered in the course of their employment," and it is declared that it is to be known as "The Workmen's Compensation Law." (Vol. 2, p. 1725.) As I have noted, all of these acts, as well as all other acts on the subject, include the scheme of compensation to dependents in the event of death. In other states the title substantially defines the act as an act for the compensation for an injury suffered or sustained *by an employee* in the course of his employment, specifying in terms nothing about death or compensation to dependents. (Iowa, vol. 2, p. 1190; New Jersey, vol. 2, p. 1375.) This indicates the existence of a very different meaning for such words as are used in our constitutional amendment, when used in describing workmen's compensation legislation, from that given to our constitutional provision by the learned counsel for petitioner. I am satisfied that in the light of the history of such legislation, the only fair conclusion is that the words of the constitutional provision, considered all together, could have been understood by the people in no other way than as meaning that compensation "irrespective of the fault of either party" could be provided for any injury (including death) suffered or sustained by an employee in the course of his employment, including compensation of dependents of the

employee in the event of death. Such is the meaning fairly indicated by the language used, in view of the subject matter of the provision.

Lawlor, J., concurred.

SHAW, J., Concurring.—I concur in the opinion of Mr. Justice Sloss.

In view of the reference therein to the constitutionality of the general scheme of the act of 1913, as determined in *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, [151 Pac. 398], I deem it necessary to add this. I do not agree that the legislature has power under the authority of section 21, article XX, of the constitution, or otherwise, to create a compulsory liability on the part of employers to compensate their employees for injuries to such employees in the course of the employment, without regard to negligence, except where the injury is caused by the negligence of the employer, or of a fellow-servant, or where the negligence of the employee merely contributes thereto, or where it occurs because of the dangers incident to the work, the place where or the appliances with which, the employee is engaged. If the injury occurs in the course of the employment solely from the negligence of the employee, and not from any of the above-mentioned causes, I do not think the state may rightfully impose on the fault-less employer any liability growing out of such injury. To do so would be a mere tyrannical exercise of physical power. I have stated my reasons more fully in my opinion in the case cited, rendered on the petition for rehearing.

HENSHAW, J., Dissenting.—I dissent from more than one of the legal conclusions declared in the prevailing opinion. In so doing I have no disposition to repeat the views which I expressed at length in my dissenting opinion in *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, [151 Pac. 398]. In this case I dissent specifically from:

1. The construction of the constitutional provision which creates "a liability on the part of all employers to compensate *their employees* for any injury incurred by the said employees in the course of their employment." By that construction it is announced that this language of the constitution, expressly limited to compensation *to* employees, means compensation *to*

heirs, *to* actual dependents, or *to* a named class of so-called dependents, without regard to their needs. Of course the constitution neither says nor authorizes this. Of course the constitution by its very words limits the liability for compensation *to* the employees, and therefore, by every canon of construction, particularly in a "revolutionary act" such as this has been described to be, should be construed only in accordance with its language. The reasoning by which the conclusion of the prevailing opinion is reached is, as well as I can follow it, along two lines. In the concurring opinion of the chief justice the argument seems to be that as laws of this nature are generally known as "workmen's compensation acts," and as in all of these laws express provision is made for the compensation of dependents for the death of the injured employee, therefore we should say that the constitution meant to include a like provision, and, furthermore, as it is a desirable thing that the whole subject matter should be left to the accident commission, we are justified in helping out this deficiency of the constitution by making it say not what it does say, but what in the opinion of this court it should have said. If this reasoning is sound, it not only opens wide the door to and justifies any form of usurpation of the legislative power by the judiciary, but goes a step farther and justifies the judicial enactment of constitutions. For such a construction of the constitution makes the people of this state declare what distinctly they declined to declare, and confers upon the legislature a power which distinctly the constitution failed, if it did not refuse, to confer upon the legislature. The unvarnished truth is that, under the guise of construction, this court is filling a manifest gap and hiatus in the law. It is inserting in the constitution important provisions of the law affecting personal rights which provisions are not expressed therein. So that hereafter this court can be justly charged not only with making laws under the guise of construction, but with framing constitutions as well.

The second line of reasoning recognizes the radical and essential differences which exist at common law (which is the basis of jurisprudence in this state, Pol. Code, 4468) between an action in tort by a person for injuries and an action for his wrongful death by his heirs, and declares, as indeed must be declared, that while the right of action to an employee for injuries existed at common law and was enforceable

against the master, damages or compensation for the wrongful death of an employee, or of anybody else, were unknown at common law. It is recognized that such was the law of this state until the right of action for the wrongful death was placed upon our books as a statutory right. But we are advised under this line of reasoning that "the analogies of the common law cannot be applied too closely to this new scheme which undertakes to supersede the common law altogether." To this I make answer that here there is no question whatsoever of analogies. It is a question of principles. Specifically, it is the question of applying the proper principles and canons of construction to this constitutional amendment. Those principles are still the principles of construction embraced and declared in the common law, repeated in our code rules of construction (Civ. Code and Code Civ. Proc., sec. 5), and reinforced by the added provision of the code to the effect that the common law of England is the rule of decision in all courts of this state (Pol. Code, 4468).

The imperative duty is thus cast upon this court to construe the scope of this constitutional grant of power to the legislature, under common-law rules governing the construction and interpretation of enactments, precisely as we would construe the same language if found in one of our legislative acts. What jurist with the slightest knowledge of the common law would dream of saying, or would dare to say, that a legislative act in the language of this constitution awarding compensation "to the injured employee," could or would be stretched to mean the creation of a right of action in the heirs or dependents of a dead employee? An act of parliament is England's supreme law, precisely as is our constitution. Could any common-law lawyer be found who would risk his reputation for sanity by declaring that an act of parliament, in the language of our constitution, included indemnification to dependents for the death of the employee. And is it not amazing, if this construction be in anywise tenable, that the same construction has not long since been put upon the common law itself? Would it not have been said (as is here said in reference to our constitutional provision) that as the common law gave a right to compensation to an injured employee, and as compensation is but another word for damages, the common law itself, without statutory enactment, gave a right of action to the heirs or dependents of the employee in the

event of his death? How much wasted time and superfluous labor have legislatures bestowed upon these and like questions if this novel rule of construction is a sound one! The framers of every workmen's compensation act thought it necessary to make express provision for compensation in the case of death. They need not have done so. Our legislature thought it necessary to make express provision for a right of action following a wrongful death. It need not have done so. In all the history of the common law, to no analyst of and no commentator on it did it ever occur that the recognized right of action to a person for injuries contained within itself the right of action to his heirs or dependents in the event of his death. We must regret this age-long deficiency in their perceptive and analytical faculties.

2. The employer in this case was concededly absolutely blameless and without fault. I deny the power of the state constitution to take the property of one man under such circumstances and to bestow it upon another. My views upon this I set forth *in extenso* in *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, [151 Pac. 398].

I have no desire to repeat them, but once more and for the last time I must dissent from a judicial declaration which amounts simply to this: Whenever the legislature despoils a blameless person or class of persons of their property to bestow it on the supposedly needy this court will say that the act of spoliation is "referable to the police power" and consequently valid. To a new liability or a new form of liability created to meet negligence or tort, actual or imputable, there can be no valid objection; actual as where the employer fails himself to observe due care for his employees, imputable as where injury results to one employee from the misconduct of another, which latter may reasonably be regarded as in a sort an agent of the employer himself. But beyond this no legitimate exercise of the police power can go; and to approve legislative acts which transcend these just and well-defined limitations is to throw wide the door to whatever form of expropriation the legislature may see fit to indulge in.

In *Calder* v. *Bull,* 3 U. S. (3 Dall.) 386, 399, [1 L. Ed. 648, 654], Justice Iredell, after discussing the legislative omnipotence of the English parliament, declares: "In order, therefore, to guard against so great an evil, it has been the policy of all the American states, which have, individually, framed

their state constitutions, since the revolution, and of the people of the United States, when they framed the federal constitution, to define with precision the objects of the legislative power, and to restrain its exercise within marked and settled boundaries. If any act of Congress, or of the legislature of a state violates those constitutional provisions, it is unquestionably void.'' In *Fletcher* v. *Peck,* 6 Cranch. (10 U. S.) 87, [3 L. Ed. 162], Chief Justice Marshall speaks as follows: "It may well be doubted, whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed where are they to be found, if the property of an individual fairly and honestly acquired, may be seized without compensation?"

I am not unmindful of the fact that these are utterances of ancient law, having both been written more than a hundred years ago. Nor am I unmindful of the modern tendency to belittle and reject all such utterances as having been made by men steeped to the lips in the wine of privilege, and incapable of understanding the present day theories of the rights of man. Nevertheless, they sat in the nation's highest judicial chairs, and until their successors in those chairs shall say that their words have lost their meaning and their constitutional expositions are obsolete, I shall continue to found my legal views on those utterances rather than on the new science of legal hermeneutics of which the prevailing opinions in this and the earlier case afford such luminous examples.

3. I dissent from the view which justifies the giving of the property of a citizen of this country to nonresident aliens who are not even within the jurisdiction of the state. By no conceivable stretch of the imagination of which I am capable can I perceive that the support of such nonresident aliens is any part of the duty of the state, or that provision for such support comes within any possible legitimate purview of the police power. I must confess to a lack of nimbleness of mind which makes it impossible for me to follow the rapidly shifting grounds upon which one or another of the terms of this law are upheld. I have heretofore expressed some of my difficulties in this regard. Thus when under the provisions of the constitution, which the constitution itself declares are mandatory, it is declared that the legislature shall impose a liability upon *all* employers, I have been unable to see how justification could be found for the act of the legislature in

exempting favored· classes of employers. The answer is made by this court that these exempted employers of labor are not favored but unfavored classes, because this law is really a benefit to the employer. But why then the legislature should be allowed to discriminate *against* certain employees remains an unanswered query. When it is asked, if the law be for the benefit of the employee, by what right are the employees of these exempted classes denied their right, we are brought back to our starting-point by the declaration that the legislature exempted them because it believed that there was less danger or risk in their employments. When the farmers' men working harvesters and threshing-machines are deprived of the benefit of this law, this court gravely states that the reason, doubtless, was that the legislature did not think that their employment was as dangerous as those of dry-goods clerks and telephone girls. Whenever a feature of the act does not appear to be for the benefit of the employer it is upheld as being a benefit to the employee. When it is not a benefit to the employee it is justified as being a benefit to the employer. And whenever it cuts too deeply into the rights of both employer and employee, then it is said to be justified by the state's interest in the general subject. And this last is the argument here advanced in support of the donation by the state of the property of its citizens to alien nonresidents.

4. I dissent from the declaration that the state may arbitrarily create and define a class of persons, and by calling them "dependents" confer upon them any man's property, and I say that this cannot be done even as an exercise of the police power. For the purposes of this argument I will concede that the property of the employer may be given to the *actual* dependents of the employee who is killed, but the *actual* dependency as a determined fact is the only basis in law or equity upon which this may be done.

5. I dissent from the views which uphold this award in full, and force full compensation to be made by only one of the deceased's six employers. This dissent has nothing to do with the construction of the law put upon it by the Industrial Accident Commission to the effect that the compensation to the deceased's dependents should be based upon his total earning capacity in his vocation. This is manifestly the sound view of the law, and this is what the Gillen case (215 Mass. 96,

[L. R. A. 1916A, 371, 102 N. E. 346]) decided and all that it decided. There was not before the Massachusetts court the question here presented, and I fail to understand how it can be thought and said that the Gillen case is authority, even of the slightest weight, for the harsh and unnecessary construction here put upon this law. The deceased was a night watchman whose services were engaged by six employers. Those six employers were continuously and contemporaneously his employers during every moment of the time that he was on duty. He was protecting the properties of all of them. He was found murdered upon the premises of one, and because of that fact, and that fact alone, the employer upon whose premises his body was found is mulct for the whole compensation due his dependents. The residents of two blocks in the city of San Francisco employ a man to carry away their garbage. These two hundred residents pay him each one dollar a month for so doing. He earns from his employment two hundred dollars a month. Upon the stairway of one of these employers he negligently falls and breaks his neck. That householder must pay the full amount of the compensation. The gardener whom fifty householders employ at a dollar a month each to take care of their garden plats is injured upon the premises of one of them. That man alone must bear all the burden of compensation. And this result is declared, notwithstanding the fact that at the time, and during all of the time, he is as much the employee of the others as of the one. It is a perfectly permissible construction of this statute to say, as is the fact, that all of these men are coemployers, and that each one shall bear his proportionate share of the award. How much more equitable this construction would be requires no word of comment. The evils arising from the other construction are most apparent. Furthermore, if this rule of construction of the statute be the true one, which of these employers will be responsible in the event that the employee is killed or injured on the sidewalk or street? If his dependents are to be compensated only by the man for whom he happens to be actually laboring at the time of the injury, then we have an omission in the law, and in such a case neither the employee for his injuries, nor his dependents for his death, could receive any compensation. Or, if this necessary construction be pushed aside, as has been done with the constitution, and it be said that some one of them will

have to compensate the injured man, then we have a liability cast at the whim, caprice, or favoritism of the injured man, of his dependents, or of the accident commission itself. So unnecessary and so injurious is this construction of the law as compared with the one which would make all the contemporaneous employers proportionately responsible, that I fail absolutely to understand why this forced, unnecessary, and unjust construction should find favor with this court.

LORIGAN, J.—I concur in the views expressed by Justice Henshaw on the construction to be given the constitutional provision respecting power of the commission to award compensation.

MELVIN, J.—I concur in all that Mr. Justice Henshaw says with reference to the construction of the language of the constitution whereby a liability of employers to compensate "their employees" is extended to include a compulsion upon them to recompense dependents of such employees. I also concur in all that he says with reference to the award of full compensation against one of numerous coemployers. It seems to me that the result reached by the majority of the court permits an injustice which calls for just such vigorous protest as my learned brother makes.

Rehearing denied.